UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MASON TENDERS DISTRICT COUNCIL　　:
WELFARE FUND, PENSION FUND,　　　　:
ANNUITY FUND, and TRAINING　　　　　:
PROGRAM FUND, and JOHN J. VIGRA,　:
in his fiduciary capacity as Director,　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　Plaintiffs,　　　　　　:
　　　　　　　　　　　　　　　　　　　　:　　　　**Memorandum & Order**
　　　　　　v.　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:　　　　05 Civ. 8211 (LBS)
M.A. ANGELIADES, INC., MERKOURIOUS　:
ANGELIADES and IRENA ANGELIADES　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　Defendants.　　　　　　:
-----------------------------------------------------------x

SAND, J.,

　　　　　Plaintiffs Mason Tenders District Council Welfare Fund, Pension Fund, Annuity

Fund, and Training Program Fund, and John J. Vigra in his fiduciary capacity as Director

(collectively "Plaintiffs") sue Defendants M.A. Angeliades, Inc., Merkourious

Angeliades ("Merkourious"), and Irena Angeliades ("Irena") (collectively "Defendants")

under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et

seq., and the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 152 et

seq., for unpaid fringe benefit contributions, tier violations, interest, statutory damages,

audit costs, attorneys' fees, and costs incurred in this action.  Plaintiffs also seek to

recover dues checkoffs, PAC contributions, and interest on behalf of non-party Mason

Tenders District Council of Great New York ("Union").  A bench trial was conducted on

July 10, 2007.  Based on the record presented by the parties, and in accordance with Rule

52(a) of the Federal Rules of Civil Procedure, the following constitutes this Court's

findings of facts and conclusions of law.

## FINDINGS OF FACT

Plaintiff Funds are jointly-administered, multi-employer, labor-management trust funds established and maintained pursuant to various collective bargaining agreements in accordance with sections 302(c)(5) and (c)(6) of the Labor-Management Relations Act of 1947 ("Taft-Hartley Act") (29 U.S.C. §§ 186(c)(5) and (c)(6)), and/or are employee benefit plans within the meaning of sections 3(1), 3(2), 3(3), and 502(d)(1) of the Employee Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C. §§ 1002(1), (2), (3), and 1132(d)(1)), and/or are multi-employer plans within the meaning of sections 3(37) and 515 of ERISA (29 U.S.C. §§ 1002(37) and 1145).  Plaintiff Funds are authorized to maintain suit as independent legal entities under section 502(d)(1) of ERISA (29 U.S.C. § 1132(d)(1)).

Non-party Union is a labor organization within the meaning of section 301 of the Taft-Hartley Act (29 U.S.C. § 185), representing employees in an industry affecting commerce as defined in section 501 of the Taft-Hartley Act (29 U.S.C. § 142) and section 3(4) of ERISA (29 U.S.C. § 1002(4)).  The Union is the representative of its constituent locals, each local being an organization operating as a labor union with more than seven members within the City and State of New York.

Defendant M.A. Angeliades is a for-profit corporation doing business in the City and State of New York as an employer within the meaning of section 3(5) and 515 of ERISA (29 U.S.C. §§ 1002(5) and 1145), and is an employer in an industry affecting commerce within the meaning of section 301 of the Taft-Hartley Act (29 U.S.C. § 185). Defendant Angeliades executed a series of collective bargaining agreements for the periods July 1, 1999, through June 30, 2002 (Pl. Ex. 1), July 1, 2000, through June 30,

2003 (Pl. Ex. 2), July 1, 2002, through June 30, 2005 (Pl. Ex. 3), and July 1, 2004, through June 30, 2005 (Pl. Ex. 4). Defendant Merkourious stipulated that he executed Exhibits 1 and 2 (Joint Pre-Trial Order, § VII, ¶¶ A and B), and defendant Irena stipulated that she executed Exhibits 3 and 4 (Joint Pre-Trial Order § VII, ¶¶ C and D).

After the commencement of this litigation, payroll audits of the books and records of M.A. Angeliades were conducted by auditors retained by the Funds, and on August 1, 2006, audit reports were issued for the periods October 1, 2000, through December 27, 2002 (Pl. Ex. 5) and December 28, 2002, through November 26, 2004 (Pl. Ex. 6). The audit included a claim for payment of fringe benefits for individuals that the Funds believe were performing work covered under the collective bargaining agreements (hereinafter "covered work"). Plaintiffs' Exhibit 5 sets forth a deficiency in the payment of fringe benefit contributions to the Funds in the amount of $382,405.02 and in the payment of dues checkoffs and PAC contributions to the Union in the amount of $42,289.00. Plaintiffs' Exhibit 6 sets forth a deficiency in the payment of fringe benefit contributions to the Funds in the amount of $45,358.15 and in the payment of dues checkoffs and PAC contributions to the Union in the amount of $3,696.15.

Pursuant to Article VI, § 17(d) of Plaintiff's Exhibit 1, p. 38, the employer is liable for the imputed cost of the audit if they are found to be substantially delinquent in the payment of fringe benefit contributions. The auditors found defendants to be substantially delinquent for the audit period set forth in Plaintiff' Exhibit 5 and imposed the imputed costs of the audit in the amount of $68,832.90 (Pl. Ex. 5, p. 11).

Plaintiffs' Exhibits 2 and 4 cover interior demolition work and establish a two-tier system of wages, with Tier A at the full scale and Tier B at a lower wage and fringe

benefit rate. (Pl. Ex. 2, sched. A). Employers are permitted to hire no more than 50 percent Tier B Workers (Pl. Ex. 2, Article III, §2(d), p. 4). The Union and the Funds were authorized to conduct quarterly audits of M.A. Angeliades and, if M.A. Angeliades hired more than 55 percent Tier B workers in any quarter, the employer is held to be substantially delinquent and is required to contribute to the Funds "the total differential in wages and benefits that the Employer should have paid had it complied with the 1:1 ratio, but did not pay." (Id. at §2(e)). The auditors found that defendants were substantially delinquent, and assessed Tier violation penalties of $436,769.41 for the period of October 1, 2000, through December 27, 2002 (Pl. Ex. 9) and $25,066.24 for the period December 28, 2002 through November 26, 2004 (Pl. Ex. 10).

The parties have stipulated that the hours of employment set forth in Plaintiffs' Exhibits 5 and 6 were actually worked by the employees listed therein (Joint Pre-Trial Order § VII, ¶¶ E and F) and that the work was performed within the geographical jurisdiction of the Union as set forth in Plaintiffs' Exhibits 1, 2, 3, and 4 (Id. § VII, G). The parties stipulated that one of the employees in the audit, Steve Malafos, did not perform covered work (Id. § VII, H), and Plaintiffs stipulated at trial that they were dropping their claim seeking recovery for 152 hours of work by Segundo Ochoa for the month of June 2004 (Tr. 35).

With regard to the type of work performed by the 19 employees at issue in this case, the audits divided the work into three categories designated by separate numbers. Group 650 is Independent Work under Plaintiffs' Exhibits 1 and 3 (Tr. 44; Pl. Ex. 5, p. 10), Group 780 is Independent Demolition Tier A (Id.), Group 790 is Independent Demolition Tier B (Id.), and Group 72 is Apprentice Work (Id.). The auditor testified,

for purposes of the audit, that an employee's classification under this three-tiered system was based on consideration of a number of factors, including, *inter alia*, their (1) wage rate, (2) remittance reports submitted by Angeliades to the Funds, (3) shop steward reports, and (4) union membership.

This Court must decide two primary issues. First, whether the 19 employees for whom the Funds are seeking to recover fringe benefit contributions, dues checkoffs, and PAC contributions were performing work within the trade jurisdiction of the Union. Second, whether defendants are liable to the Funds for a substantial violation of the Tier A/Tier B ratio set for in Plaintiffs' Exhibits 2 and 4.

## CONCLUSIONS OF LAW

### A.  Plaintiffs Are Not Entitled to a Shift of the Burden of Proof

The Sixth, Ninth, and Eleventh Circuits have held that a fund's or trustee's production of evidence raising genuine questions concerning an employer's failure to maintain adequate records shifts to the employer the burden of coming forward with evidence either of the precise number of hours worked or to negate the reasonableness of the inferences to be drawn from the employee representative's evidence. See Michigan Laborers' Health Fund v. Grimaldi Concrete, Inc., 30 F.3d 692, 696-697 (6th Cir. 1994); Brick Masons Pension Trust v. Industrial Fence & Supply, Inc., 839 F.2d 1333, 1338 (9th Cir. 1988); Combs. v. King, 764 F.2d 818, 825-826 (11th Cir. 1985). While the Second Circuit has not yet decided the applicable standard in these cases, it has both favorably discussed this burden shifting analysis, see, e.g., New York State Teamsters Council Health and Hospital Fund v. Estate of DePerno, 18 F.3d 179, 183 (2d Cir. 1994); Jaspan

v. Glover Bottled Glass Corp., 80 F.3d 38, 41 n.3 (2d Cir. 1996), and declined to apply it, see Mastrandrea v. Nassau Land Improvement Co., Inc., 182 F.3d 900 (2d Cir. 1999).

The District Courts of New York have applied the burden-shifting analysis adopted by the Sixth, Ninth, and Eleventh Circuits.  See, e.g., Barbera v. A. Morrison Trucking, Inc., 2004 WL 3741664 (E.D.N.Y. Mar. 8, 2004); Grabois v. Action Acoustics, Inc., 1995 WL 662127 (S.D.N.Y. Nov. 9, 1995).  However, before the burden is shifted to the employer, the employee representative must first "raise genuine questions about the accuracy of the employer's records and [about] the number of hours actually worked."  A. Morrison, *supra* at *10.  The burden-shifting is not triggered when the employer maintains adequate records.  Moreover, to successfully shift the burden, the employee representative must "have produced sufficient evidence to show the *amount* and *extent* of the work for which [employees] were not properly compensated as a matter of just and reasonable inference."  Mastrandrea, *supra* (quoting Combs, 764 F.2d at 826). The Mastrandrea court went on to explain that although this approach involves a "'relaxed standard of proof,' it is possible for plaintiffs' proof to be 'too speculative to support a finding' of damages."  Id. (quoting Brick Masons, 839 F.2d at 1339 n. 4).

Angeliades provided the auditor with all books and records requested, including payroll forms, tax filings, journals and ledgers.  (Tr. 39-40, 90).  Moreover, the Plaintiffs acknowledged that Angeliades' records were accurate.  First, Mr. Giammona, the manager of the "contributions and deficiency [sic] department," (Tr.22), acknowledged that his office found no discrepancies between what Angeliades reported to the union and what the shop stewards – the individuals who are assigned by the union to keep track of individuals performing mason tenders work – reported.  (Tr. 27).  Second, upon cross-

examination, auditor William Austin conceded that to the best of his knowledge, there was nothing inaccurate about Angeliades' records. (Tr. 71).

Despite having an opportunity to conduct an audit, depose the Merkourious and Irena Angeliades, present witnesses, and cross-examine defendants' witnesses during trial, the Plaintiffs did not demonstrate that Angeliades failed to maintain adequate books and records nor did they raise any genuine issue about the accuracy of those records. Therefore, plaintiffs are not entitled to a burden shift.

**B.  Plaintiffs Failed To Meet Their Burden of Proof as the Audit Was Based On Unreasonable Assumptions and Speculation**

Plaintiffs' audit of Defendants' books and records revealed delinquencies in fringe benefit contributions, dues checkoffs, and PAC contributions for a number of M.A. Angeliades employees. However, the Court must examine whether the assumptions and techniques relied upon by the auditors were reasonable, or rather rendered the Plaintiffs' audit simply "'too speculative to support a finding' of damages." <u>Mastrandrea v. Nassau Land Improvement Co., Inc.</u>, 182 F.3d 900 (2d Cir. 1999) (citation omitted).

As is apparent from the evidence presented at trial, the audit was the sole basis for Plaintiffs' action. Mr. Bianco, a field representative for the Plaintiffs testified that he was responsible for the enforcement of the collective bargaining agreements. (Tr. 2). Yet, he obtained no written complaints from a worker, a shop steward, or business agent (Tr. 16-17, 19); kept no written notes (Tr. 16); never filed a grievance against M.A. Angeliades in accordance with collective bargaining agreements (Tr. 17); and never even reviewed the audit that is the entire basis for this action (Tr. 21). Likewise, Mr. Giammona, the manager of the contributions and deficiency department (Tr. 22), never received a

complaint from any worker regarding their compensation (Tr. 33) nor from any shop steward report regarding either "the worker's compensation or the nature of work they're performing at a project site" (Tr. 34). Significantly, Mr. Giammona did not recall there being any discrepancy between the remittance reports submitted by Angeliades and the shop steward reports prepared by the union's representatives. (Tr. 27)[1]

The auditor, William Austin, had no personal knowledge of the work performed by the alleged individuals (Tr. 53); he never received a written complaint from any worker or shop steward (Tr. 54); he did not visit a job site (Tr.54); and his firm did not interview any workers or shop stewards (Tr. 52, 54). As Mr. Austin explained, the factors the auditors considered in determining how to categorize an employee were:

> Their wage rate; if they've been reported; if they appeared on shop steward reports; if they're a member in the union; if they reported to another jurisdiction where the work was actually done; based on some member complaints; if they were on the company's health plan or on the company's retirement plan; if they were on their auto insurance plan. Anything, any information to the contrary that they weren't doing covered work, we would factor in.

(Tr. 40). He expanded upon his answer by stating that an employee's category was

> based upon their wage rate, and in this particular audit, it was a combination of factors and it was based on their wage rate and their reportage history, how they were reported both prior to the audit period, during their time with M.A. Angeliades and after the audit period, and *we tried to place the individuals where we believed they were*, what they were doing.

(Tr.42) (emphasis added).

Plaintiffs explained in their Supplemental Memorandum that "[t]he inclusion of an employee in a remittance report, shop steward report, or union roster led to a *rebuttable presumption* that the employee was performing covered work." (Pl. Supp.

---

[1] Plaintiffs, however, note a discrepancy of over 100,000 hours between the remittance and shop steward reports. See note 3, *infra*.

Mem. at 9) (emphasis added).  "[I]t is also clear that once a determination was made that an employee was performing covered work, all of that employee's hours during the audit period were included in the audit."  (Id. at 10).  Thus, the Plaintiffs' auditor apparently made three assumptions:

> (1) if an individual earned at a rate even remotely close to a mason tenders' rate, all of his hours were included;
>
> (2) if an individual was listed on even one shop steward report during the entire four-year period covered by the audit, all of his hours worked for the company were included, regardless of what that individual was doing on the days in which he is not found on any shop steward report; and
>
> (3) if an individual became a member of the union at any point in time, all of his hours were to be included regardless of what duties the employee performed prior to joining the union.

Each of these assumptions is unrealistic and patently unreasonable.

First, according to the defendants, "Mason Tenders earn a basic rate similar to most construction employees: $15-25 per hour.  A Mason Tender is not such a skilled laborer such as an operator, electrician, or carpenter so as to command rates such as $40, $50, and up to $100 per hour.  They perform simpler tasks, such as cleaning up at project sites and demolishing walls.  The rates such workers command is virtually the same as an individual who drives a truck to deliver materials to a project site, a warehouse worker, or project manager's assistant."  (Def. Supp. Mem. at 10).  Thus, the plaintiffs' assumption that a person earning a rate similar to a mason tender must be performing mason tenders

work rather than miscellaneous tasks – such as picking up materials, assisting project managers, driving a truck, or working in a warehouse or yard – is unreasonable.

Second, the shop stewards[2] did not generally report the individuals alleged to have unreported hours as having performed covered work during the periods in question. For example, Plaintiffs' audit alleges that Mr. Gustavo Chimbo and Mr. Jose Chiugansea were performing covered work from February 2001 through December 2001. (Tr. 57-58; Pl. Ex. 5). For that entire time period, however, Messrs. Chimbo and Chiugansea are reported on only one shop steward report and only for one day. (Tr. 58; Def. Ex. A (1 of 2)). The same is true for virtually all of the individuals that have been identified in the audit as having unreported hours. (Tr. 58-59) (Def. Ex. A). A sample of these discrepancies are listed below:

- The audit lists as unreported hours work allegedly performed by Angel Ortiz in the year 2000 through mid-2001. However, none of the shop steward reports for that time period show Mr. Ortiz as performing mason tenders-type work during that time period. (Def. Ex. A, Tabs 1-7).

- The audit lists Mr. Javier Diaz as having performed covered work from July 2001 through December 2001. However, there are no corresponding entries for Mr. Diaz on any shop steward reports for that period. (Def. Ex. A, Tabs 8-13).

- The audit lists Mr. Julio Palaez as having performed covered work from October 2000 through July 2001. Mr. Palaez does not appear on any corresponding shop steward reports. (Def. Ex. A., Tabs 1-13). The same is true for Angel Robles and Manuel Inamagua.

- The audit lists Mr. Alfonso Yuquilima as having performed covered work from October 2000 through December 31, 2001. However, Mr. Yuquilima is not set forth on any shop steward reports from 2000 through November 2001. (Def. Ex. A, Tabs 1-12).

---

[2] The purpose of a shop steward is to note the attendance of those performing mason tenders' work. (Tr. 57-58). He or she is selected by the union (Tr. 57-58), and is responsible for submitting reports that set forth the names of individuals performing covered work (Id.). Those reports are submitted directly to the Plaintiffs, and the employer is not provided a copy of what is submitted. (Tr. 18-19).

Clearly, the Plaintiffs' auditors did not incorporate the data supplied by their own documents – the shop steward reports – into their audit results. The significant discrepancies between the shop steward report data and the unreported hours found by the audit cast grave doubt on the assumptions which were reflected in the audit. For their part, plaintiffs' did not adequately explain these glaring inconsistencies at trial.[3]

Third, most of the individuals listed in the auditor's report became union members at some point in time. A substantial part of plaintiffs' claim seeks contributions for work performed by those individuals *prior* to their union membership. Now while an assumption such as no. 3 above may be somewhat reasonable if this matter involved electricians, plumbers, operating engineers or other licensed and professionally skilled trades, which require a substantial amount of training and experience, the same cannot be said for mason tenders, whose general job duties include sweeping, cleaning, and demolition work. The simple fact is that mason tending does not require the training or previous experience of an electrician, plumber, or operating engineer. Therefore, an assumption that an individual was performing mason tenders-type work during the entire period he worked at M.A. Angeliades simply because he later joined the union is not reasonable. That individual could just as easily have been picking up materials, assisting project managers, driving a truck, or working in a warehouse or yard – all activities not covered under the collective bargaining agreements, absent any other evidence of what work that person performed (e.g., a shop steward report).

---

[3] In their Supplemental Memorandum, Plaintiffs explain "that the shop steward hours do not correspond exactly to the hours reported on the remittance reports, as there is a difference of over 100,000 hours. Thus, it is also clear that many of the unreported hours for which the Funds are seeking contributions from defendants are not included on shop steward reports." (Pl. Supp. Mem. at 11). The Court rejects Plaintiffs' logic. A large discrepancy between total reported hours on remittance reports and total shop steward report hours does not adequately justify the specific inconsistencies between the shop steward reports and the audit's unreported hour findings.

The absence of employee complaints or records or complaints from the shop steward would of course not be dispositive if there were *any* documentary evidence in the record that an employee who became a union member engaged in covered work at an earlier date. There is no such documentary evidence. The Plaintiffs' rely on the dubious presumption that an employee who eventually became a union member must have engaged in covered employment at all times prior to his union membership. Such a rule would not only be counterintuitive, it would be contrary to the interests of the employees. Such a presumption would discourage the employer from promoting its own employees to higher paying positions. If the consequences of advancing an employee to work in covered employment would be to require the employer to make union contributions for the entire length of that person's employment, internal promotion would be discouraged because it would entail a cost avoidable if a new hire were given the higher paying position. The total absence of any evidence in the records of the union-designated shop steward that covered employment took place prior to union membership leads us to the conclusion that Plaintiff cannot prevail where reliance on its presumption that prior covered employment must have occurred is the sole basis of the claim as to many of the employees at issue.

Having failed to establish that Angeliades' records were inaccurate – and even acknowledging their accuracy (Tr. 27, 71) – the Plaintiffs bear the burden of proof to establish its claim with regard to unpaid fringe benefit contributions, dues checkoffs, and PAC contributions. Without personal knowledge as to the duties performed by each

employee, the auditor made unreasonable assumptions and questionable judgment calls[4] which tainted the audit's findings of unreported hours. The audit results, therefore, are insufficient to establish Defendants' liability for unpaid fringe benefit contributions, dues checkoffs, and PAC contributions.

## C. The Testimony of the Ortiz Relatives and Francisco Rosas Support the Plaintiffs' Claims for Those Individuals

There is no dispute that the four individuals who testified at trial – Jose Ortiz, Jose T. Ortiz, Angel Ortiz, and Francisco Rosas – worked for M.A. Angeliades. There is also no dispute that in mid-2001, these individuals became members of the Local 79 and that from that time they performed mason tenders work and benefits were paid on their behalf. (Tr. 107-108). The Plaintiffs' claim is limited to an allegation that these individuals were performing covered work prior to their union membership. Defendants dispute this allegation. The issue, specifically, is whether these individuals were performing covered work from the end of 2000 through early to mid-2001.

None of the shop steward reports dated prior to these four individuals' union membership lists any of them as performing mason tenders work. (Def. Ex. A). However, the testimony of these four individuals confirms that they did indeed perform covered work from the end of 2000 through early to mid-2001:

Francisco Rosas. Mr. Rosas testified that he was employed by Angeliades from 1994 through 2003. (Tr. 128). Mr. Rosas joined Local 79 in June 2001. (Id.) M.A. Angeliades did not pay benefits for Mr. Rosas during the period from October 2000 through May 2001, and began paying his benefits in June 2001 (with the exception of 21

---

[4] For instance, several affidavits were submitted by individual employees stating that they did not perform mason tenders work during the periods in question (Pl. Ex. 5, p. 5-9), but these were ignored by the auditor. Plaintiffs never explained at trial the auditor's decision to ignore these affidavits.

hours).  (Pl. Ex. 5).  Mr. Rosas testified that during that period he was working for M.A.

Angeliades at Rikers Island, performing primarily covered laborer's work (e.g.,

"cleaning").  (Tr. 128-129).  He further testified that he performed the same type of work

after June 1, 2001.

Angel Ortiz.  Angel Ortiz testified that he worked for M.A. Angeliades from 1997

through March 2003.  (Tr. 76).  He became a member of Local 79 in April 2001.  (Id.).

M.A. Angeliades did not pay benefits for Angel Ortiz during the period from October

2000 through May 2001, and began paying his benefits in June 2001.  (Pl. Ex. 5).  Angel

Ortiz testified that during this time he was working for M.A. Angeliades at Rikers Island,

primarily performing covered laborer's work (e.g., cleaning and general condition work).

(Tr. 77-78).  He testified that his work at Rikers Island, and for M.A. Angeliades

generally, did not change after June 1, 2001.  (Tr. 79).

Irena Angeliades testified that Angel Ortiz, Jose R. Ortiz, and Jose T. Ortiz were

employed "to put them at job sites to assist the superintendents."  (Tr. 108).  She

identified this work as "take the work orders and bring them to the project managers…fill

out and call into the drivers what materials are needed for the next day, what the scope is

going to be for the next day."  (Id.).  On cross-examination, Angel Ortiz was never asked

specifically whether he performed any of the "assist the superintendent" work, and, in

response to a general question as to the type of work he performed at Rikers Island, he

stated, "Labor.  We cleaning, we mix some water for the big cleaners."  (Tr. 83).  Upon

further questioning, he added that he helped "the carpenters to make some walls in there."

(Id.).  Defendants did not call any job superintendents to testify as to what work Angel

Ortiz performed, and there is no support on this record for the claims of Irena as to the

changes in his work assignments once Angeliades began making fringe benefit contributions on his behalf.

Jose R. Ortiz.  Jose R. Ortiz testified that he worked for M.A. Angeliades commencing in 1997.  (Tr. 122).  He became a member of Local 79 in 2001.  (Id.).  M.A. Angeliades did not pay benefits on his behalf during the months of October through December 2000 or during May 2001, and began paying benefits on his behalf during June 2001.  (Pl. Ex. 5).  During the period prior to June 2001, Jose R. Ortiz was working at Rikers Island, doing covered laborer's work, including cleaning, helping the bricklayers, and working on a mixer.  (Tr. 123).

The only testimony defendants provided concerning the work performed by Jose R. Ortiz prior to the time M.A. Angeliades began paying benefits on his behalf was the testimony by Irena Angeliades that he was hired to assist the superintendents at job sites.  (Tr. 108).  On cross-examination, he was asked no questions concerning the type of work he performed for M.A. Angeliades during any of his time as an employee.

Jose T. Ortiz.  Jose T. Ortiz testified that he worked for M.A. Angeliades beginning in 1997 and worked for M.A. Angeliades for approximately seven years.  (Tr. 134).  He became a member of Local 79 in 2001.  (Tr. 133).  M.A. Angeliades did not pay benefits on his behalf during the period from October 2000 through May 2001 and began paying benefits on his behalf in June 2001.  (Pl. Ex. 5).  Jose T. Ortiz testified that at Rikers Island he performed covered work including general conditions work, Tr. 135, as well as breaking walls and mixing concrete, Tr. 136.  He testified that he primarily performed covered general conditions work during the time he was employed by M.A. Angeliades.  (Tr. 134).

As with Jose R. Ortiz, the only testimony defendants provided concerning the work performed by Jose T. Ortiz prior to the time M.A. Angeliades commenced paying benefits on his behalf was the testimony by Irena that he was hired to assist the superintendents at job sites. (Tr. 108). On cross-examination, he was asked no questions concerning the type of work he performed for M.A. Angeliades during any of his time as an employee.

The Court finds the testimony of the three Messrs. Ortiz and Mr. Rosas that they were performing covered work during the time periods in question to be credible. Thus, Plaintiffs have established their claim for unpaid fringe benefits contributions, dues checkoffs, and PAC contributions with regard to these four individuals.

**D. Plaintiffs' Tier Violation Claim Is Unsupported**

The Plaintiffs' case is essentially made up of two components: a claim for fringe benefit contributions, dues checkoffs, and PAC contributions for individuals the Plaintiffs believe were performing covered work, as discussed above; and a claim that the Defendants allegedly committed a "Tier Violation" as set forth in Article III of the Independent Interior Demolition Agreement. (Pl. Ex. 2, Article III(2)(b)-(e)). The Plaintiffs seek approximately $461,000 under the "Tier Violation" component of their claim. According to the Plaintiffs, "the determination of a substantial violation of the Tier A/Tier B ratio is determined, primarily by a review of the M.A. Angeliades Remittance Reports." (Pl. Closing Mem. at 4).

The nature of the Tier Violation is that the agreement requires that for every Tier B worker, M.A. Angeliades must employ a Tier A worker. (Tr. 34). In conducting his audit of M.A. Angeliades' records, auditor William Austin found that M.A. Angeliades

committed a violation of the agreement's tier provision. (Pl. Ex. 9). The auditor determined that in the fourth quarter of 2000 as well in the first, second, and fourth quarters of 2001, Angeliades had reported no Tier A hours. Irena Angeliades testified that she did not commit any violation and that the auditor's findings were simply the result of the company using the wrong form in reporting the hours worked. (Tr. 111-113). Specifically, Ms. Angeliades testified that:

> A:     Again, we would receive two remittance reports in the mail every month by the Mason Tenders. One was a Tier A or what I thought was a Tier A report, because its rate of pay was what I thought to be a Tier A rate, because they're so similar with the independent, and the second was a tier B report, which is a no-brainer, because the dollar amount is significantly less.
> Q:     So there were times you would submit a tier A worker on an independent report?
> A:     Without realizing I was doing so, yes.

(Tr. 111).

Upon realizing her error, Ms. Angeliades notified the union and was assured it would not be an issue. (Tr. 111). Ms. Angeliades' testimony is corroborated by two significant pieces of evidence. First, there was no financial gain to be had by reporting an individual as an independent worker rather than a Tier A worker. By reporting individuals as workers under the independent agreement (a/k/a group 650) rather than Tier A workers, Angeliades was actually paying approximately $0.30 more per hour (multiplied by several thousand hours) than what was actually due the funds for these workers. (Tr. 17, 111-112). Second, the plaintiffs' own documents, the shop steward reports, state that Tier A work was being performed during these periods. (Def. Ex. A).

While the Plaintiffs claim that the Tier Violations were determined from the remittance reports,[5] Mr. Austin testified that in determining whether there was a tier violation, he would also refer to the shop steward reports. (Tr. 63). Despite this testimony, his findings demonstrate that he actually ignored them. (Pl. Ex. 9). Specifically, in determining whether M.A. Angeliades committed a Tier Violation and how much the penalty would be, the auditor's report states that no Tier A hours were worked in the fourth quarter of 2000 or in the first, second, and fourth quarters of 2001. (Pl. Ex. 9). The shop steward reports, however, demonstrate that Tier A hours were worked in the fourth quarter of 2000 as well as in the first, second, and fourth quarters of 2001. (Def. Ex. A (1 of 2)).

The shop steward reports contain two entries that indicate what type of work was performed. On the top of the forms is a box that says "ATTENTION: Tier A and Tier B workers must be documented on separate Shop Steward Reports. You must indicate which Tier this report is for:" and then states "(Circle One)" with Tier A and Tier B below it. (Def. Ex. A). The fourth line of each shop steward report states "Job Type," and the shop stewards list the type of work (e.g., "Demo & Restoration"). During those quarters where the audit showed no Tier A hours being worked, the shop stewards indicated that Tier A work was being performed by circling "Tier A" on many of the daily forms. Mr. Austin attempted to discredit Plaintiffs' own records by alleging that the "Job-Type" description is what determined the type of work rather than if the shop steward circled the item "Tier A," (Tr. 66) at the top of the report, and that the "Tier" hours are only included when the workers performed "demolition" work. (Tr. 66). This

---

[5] Plaintiffs state that "The tier violation amounts are thus based *solely* upon defendants' records." (Pl. Closing Mem. at 17).

testimony, however, only confirms that the auditor ignored the shop steward reports. All of the shop steward reports for the fourth quarter of 2000 expressly state "Job Type: DEMO & RESTORATION" (Tr. 66-67) (Def. Ex. A, Tab 1). On the second report (as well as many others) in January 2001, the report expressly states: "Job Type: Demolition" (Def. Ex. A, Tab 2). The auditor also acknowledged that he never spoke to a shop steward about how the reports are filled out. (Tr. 67). Moreover, although he testified that one report's reference to "mason tending" led him to believe that it was "650-type work," (Tr. 65-66), he later acknowledged that workers performing demolition work (Tier A and Tier B) are also commonly referred to as "mason tenders." (Tr. 69). Mr. Austin even speculated that the shop stewards just circle anything without thought, although he has never even interviewed a shop steward. (Tr. 67).

We find that plaintiff's auditor did not perform the diligence necessary to properly incorporate the data provided by the shop steward reports. Mr. Austin did not interview shop stewards concerning their procedures for filling out the reports, but rather made assumptions without any personal knowledge of the protocols followed by these union representatives. He apparently did not know how to interpret the shop steward reports, took no steps to gain such knowledge, and ultimately decided to ignore the relevant information these documents provided. Dismissing the probative evidence provided by the Plaintiffs' own documents throws the audit's final figures regarding Tier Violations into question. Moreover, the Tier Violation figures also include unreported hours worked by individuals the audit – with its unrealistic and speculative assumptions – picked up as performing covered work.

In total, the auditor ignored the probative evidence provided by the shop steward reports and incorporated unreasonably speculative "unreported hours" to calculate the Tier Violations. Therefore, this Court finds that the Plaintiffs' Tier Violation figures are inherently flawed and cannot support liability.[6]

### E.  Merkourious and Irena are Not Personally Bound By and Parties to the Collective Bargaining Agreements

Plaintiffs contend that defendants Merkouious and Irena are personally bound by the collective bargaining agreements that they signed, respectively.

   1.  <u>Merkourious</u>

The following clause is found on page fifty-six of Plaintiffs' Exhibit 1, the Independent Collective Bargaining Agreement, 1999-2002, directly above the signature lines:

> IN WITNESS WHEREOF the parties hereto have caused this Agreement to be signed this day and year by their duly authorized officers, and represent to each other that they were duly authorized to enter this Agreement.  The person signing on behalf of the Employer also agrees to be personally bound by and to assume all obligations of the Employer provided in this Agreement and he warrants and represents that he has the authority to bind the Employer and principals or members thereof.

Merkourious signed Plaintiffs' Exhibit 1 twice, Joint Pre-Trial Order, ¶ A, directly below the aforementioned paragraph, once on behalf of defendant M.A. Angeliades and once (purportedly) on behalf of himself.  Joseph Bianco, a representative of the Union, testified that the second signature line was added "to establish a personal obligation on behalf of the employer to the union and the workers, and that is why we added the second

---

[6] Because Plaintiffs failed to prove their Tier Violation claims, we need not reach the issue of whether the claims themselves are time-barred or whether plaintiffs failed to exhaust their administrative remedies based on Article X of the Interior Demolition Agreement.  (<u>See</u> Pl. Ex. 2, Article X)

signature line.  The second signature line was a personal obligation signature line."  (Tr.

5).

Merkourious also signed Plaintiffs' Exhibit 2, the Independent Interior

Demolition Collective Bargaining Agreement, 1999-2002.  Joint Pre-Trial Order, § VII, ¶

B.  Plaintiffs' Exhibit 2 contains the following language on page twenty-three, directly

above the signature line:

> IN WITNESS WHEREOF the parties hereto have caused this Agreement to be
> signed this day and year by their duly authorized officers, and represent to each
> other that they were duly authorized to enter this Agreement.  **The person signing
> on behalf of the Employer also agrees to be personally bound by and to
> assume all obligations of the Employer provided in this Agreement** and he
> warrants and represents that he has the authority to bind the Employer and
> principals or members thereof.

(emphasis in original).  Mr. Bianco testified that the Union placed the language in bold

print based upon "the union's wish to bind an individual, not just a [corporation], but an

actual individual, for the obligations to the union and to the funds." (Tr. 7).

2.  <u>Irena</u>

Irena executed Plaintiffs' Exhibit 3, the Master Independent Collective

Bargaining Agreement, 2002-2005.  Joint Pre-Trial Order, § VII, ¶ C.  Plaintiffs' Exhibit

3 contains the following language on page forty-one, directly above the signature line:

> IN WITNESS WHEREOF the parties hereto have caused this Agreement to be
> signed this day and year by their duly authorized officers, and represent to each
> other that they were duly authorized to enter this Agreement.  **The personal
> signing on behalf of the Employer also agrees to be personally bound by and
> to assume all obligations of the Employer provided in this Agreement** and he
> warrants and represents that he has the authority to bind the Employer and
> principals or members thereof.

(emphasis in original).  Mr. Bianco testified that the highlighted language was put in bold print because "[t]he union wanted a personal obligation from the person signing the agreement."  (Tr. 12).

Irena also executed Plaintiffs Exhibit 4, the 2002-2005 Demolition Side Letter (Interior and Total).  Joint Pre-Trial Order, § VII, ¶ D.  Plaintiffs' Exhibit 4 contains the following language on page five, the signature page:

> IN WITNESS WHEREOF the parties hereto have caused this Agreement to be signed this day and year by their duly authorized officers, and represent to each other that they were duly authorized to enter this Agreement.  **The person signing on behalf of the Employer also agrees to be personally bound by and to assume all obligations of the Employer provided in this Agreement** and he warrants and represents that he has the authority to bind the Employer and principals or members thereof.

(emphasis in original).  Plaintiffs' Exhibit 4 also contains the following language on page five, immediately above the space for Irena's signature: "For the Employer and its below referenced officer in his personal and representative capacities."  Mr. Bianco testified that this language was inserted because "[t]he union wanted a personal obligation from the person signing the document, signing the agreement."  (Tr. 11).

3. <u>Applicable Law</u>

As explained by the Second Circuit, "New York courts have found individual liability only in rare cases" since there must be "overwhelming evidence of the signatory's intention to assume personal liability."  <u>Mason Tenders District Council Welfare Fund v. Thomsen Construction Company, Inc.</u>, 301 F.3d 50, 53 (2d Cir. 2002) (citations omitted).  This rule is supported by the rationale that "'[i]n modern times most commercial business is done between corporations,' not individual stockholders or officers of the corporation."  <u>Id</u>. (citations omitted).  "[T]he mere presence of a personal

liability clause in" an agreement signed by an officer of a corporation, without more, does

not establish the 'high degree of intention' needed to assign personal liability." Mason

Tenders District Council v. A.G.I., Inc., 2005 WL 1565831 (S.D.N.Y. June 8, 2005)

(quoting Thomsen, 301 F.3d at 54).

In Cement and Concrete Workers District Council Welfare Fund v. Lollo, 35 F.3d

29 (2d Cir. 1994), the Second Circuit found an individual signatory to be bound by and a

party to a collective bargaining agreement when considering language comparable to the

language in the Agreements in the present case. The Lollo court found that "[t]he factors

to be examined in assessing the signatory's intention include the length of the contract,

the location of the liability provision(s) in relation to the signature line, the presence of

the signatory's name in the agreement itself, the nature of the negotiations leading to the

contract, and the signatory's role in the corporation." Lollo, 35 F.3d at 35. It should be

noted that in Lollo, the signatory signed once, and the language at issue was not

highlighted by the union.

In Lollo, the Second Circuit considered a personal liability clause with language

comparable to the personal liability clause in this case. The Lollo court stated:

> Article XXV of the Agreement expressly stated that the signatory signs "in a dual
> capacity both on behalf of himself and on behalf of the Employer and represents
> by his signature his authority to bind himself, the Employer or Firm, and the
> principals and members thereof. The person signing on behalf of the Employer
> also agrees to be personally bound by and to assume all obligations of the
> Employer provided for in this Agreement."

Id. In determining whether the language in the collective bargaining agreement would

bind the signatory, the Court concluded that the signatory provision

> unequivocally fixes personal liability on the signatory and is prominently
> displayed immediately above the signature line. Moreover, defendants do not
> dispute the Union's assertion that the provision was expressly bargained for and

reached after much negotiation. Finally, although [the signatory's] name was not included in the text of the agreement, it was written into the contract above the signature line, and it is undisputed that [the signatory] had the authority to sign on behalf of the Company as its President and on behalf of himself.

Id.

The Second Circuit thus held that the signatory provision personally obligated the signatory for the duties owed by the company under the collective bargaining agreement. Id. We examine each of the Lollo factors as applied to the instant action.

First, with respect to contract length, Plaintiffs' Exhibit 1 is only one page longer than the fifty-five page collective bargaining agreement whose personal liability clause was upheld in Lollo. Plaintiffs' Exhibit 2 is 23 pages, Plaintiffs' Exhibit 3 is 41 pages, and Plaintiffs' Exhibit 4 is 5 pages, all shorter than the contract in Lollo.

Second, as in Lollo, the personal liability clauses in this case were prominently displayed above the signature line in the agreements. Moroever, in Plaintiffs' Exhibits 2, 3, and 4, the language was bolded.

Third, with respect to the placement of the signatory's name in the Agreement itself, Merkourious and Irena handwrote their names below their signatures. These facts are identical to those in Lollo, where the Second Circuit noted that although the defendant's "name was not included in the text of the agreement, it was written into the contract above the signature line." Lollo, 35 F.3d at 35.

Fourth, as President of Angeliades (Merkourious) and Vice-President with responsibility for dealing with labor unions (Irena), both individual defendants met the requirement in the personal liability clause requiring that a corporate officer with the authority to bind defendant M.A. Angeliades sign the agreement.

Fifth, with regard to Merkourious' signing of Plaintiffs' Exhibit 1, the Second Circuit has noted that "the New York Court of Appeals has observed that 'where individual responsibility is demanded the nearly universal practice is that the officer signs twice – once as an officer and again as an individual." Mason Tenders District Council Welfare Fund v. Thomsen Const. Co., Inc., 301 F.3d 50, 54 (2d Cir. 2000) (quoting Salzman Sign Co. v. Beck, 10 N.Y.2d 63, 67 (1961)). The Second Circuit added that while it had never held that two signature lines were required for personal liability to be imposed, the fact that in Thomsen there was only one signature line supported the soundness of the district court's decision not to impose personal liability. Id. In the instant case, with regard to Merkourious, the fact that he signed the collective bargaining agreement twice on separate signature lines might indicate an intent to be personally bound.

However, despite the apparent similarities between this case and Lollo, no evidence was presented in the instant action indicating that the personal liability provisions were negotiated or even discussed. Indeed, the testimony of Joseph Bianco, field representative of the Mason Tenders District Council, indicated that the Agreements were delivered and signed without mention of personal obligations:

> Q: Mr. Bianco, did you have any role in the negotiation of the collective bargaining agreement with Angeliades?
> A: No.
> Q: You had no personal involvement?
> A: My office sent them the agreement, and I don't recall if I had discussions with Mr. Angeliades or Ms. Angeliades.
> Q: So you never had any conversations with them about being personally obligated under the agreement?
> A: I don't recall.

(Tr. 15).   Unlike the provision in the <u>Lollo</u> contract that "was expressly bargained for and reached after much negotiation," the personal liability clauses in the M.A. Angeliades collective bargaining agreements were – on this record – apparently not the subject of *any* negotiation or discussion.  Without such evidence of bargaining, Plaintiffs have failed to demonstrate that this case represents one of those "rare" instances in which there is "overwhelming evidence of the signatory's intention to assume personal liability."  <u>Thomsen</u>, 301 F.3d at 53.  This Court, therefore, declines to extend personal liability on either Angeliades.

**CONCLUSION**

Plaintiffs failed to meet their burden of proof at trial with regard to their claims for Tier Violations.  Plaintiffs have proved that they are entitled to unpaid fringe benefit contributions, dues checkoffs, PAC contributions, interest on fringe benefit principal pursuant to ERISA Section 502(g)(2)(B) (29 U.S.C. § 1132(g)(2)(B)), statutory damages under ERISA Section 502(g)(2)(C) (29 U.S.C. § 1132(g)(2)(C)), mandatory reasonable attorney's fees and costs pursuant to ERISA Section 502(g)(2)(D) (29 U.S.C. § 1132(g)(2)(D)), and interest on dues checkoffs and PAC contributions pursuant to N.Y.C.P.L.R. § 5001(a) *solely* for employees Francisco Rosas, Angel Ortiz, Jose R. Ortiz, and Jose T. Ortiz.[7]

The Plaintiffs are to a submit a proposed order accompanied by affidavits by January 8, 2008, detailing the amounts due for each of the above categories of damages related *solely* to unreported hours performed by Francisco Rosas, Angel Ortiz, Jose R. Ortiz, and Jose T. Ortiz from the end of 2000 to early to mid-2001.  Defendants may

---

[7] The auditors found Defendants to be substantially delinquent for the audit period set forth in Plaintiff' Exhibit 5 and imposed the imputed costs of the audit in the amount of $68,832.90 (Pl. Ex. 5, p. 11).  As the Court finds the audit to be inherently flawed, this amount is unrecoverable.

submit a counter-order and affidavits by January 22, 2008.  The Court declines to award

attorneys fees or costs to either party under Section 502(g)(1) of ERISA (29 U.S.C. §

1132(g)(1)).

      SO ORDERED.

Dated: November 2, 2007
       New York, NY

                                _____
                                          U.S.D.J.

27